IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLISON COOPER, et al. | : | |
| | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| vs. | : | NO. 06-CV-888 |
| | : | |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY | : | |
| | : | |
| Defendant | : | |

MEMORANDUM OPINION AND ORDER

GOLDEN, J.                                                MARCH 16, 2010

        Plaintiffs, bus drivers for Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA"), brought this collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., seeking compensation for time spent performing required pre-trip safety inspections of their buses during a "swing run". Presently before the Court is SEPTA's Motion to Dismiss the Second Amended Complaint pursuant to Rule 12(1) or, in the alternative, pursuant to 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the Motion is denied.

        Plaintiffs filed the initial Complaint in this matter on February 28, 2006. On March 23, 2006, SEPTA filed a Motion to Dismiss based solely on the contention that it was immune from suit under the Eleventh Amendment. Plaintiffs also filed a Motion for Class Certification, which SEPTA opposed. By Memorandum Opinion and Order dated February 12, 2007, the Court treated the Motion to Dismiss as a Motion for Summary Judgment and denied the Motion.

        On February 20, 2007, SEPTA filed an appeal from the Court's February 12, 2007 Memorandum Opinion and Order to the Third Circuit. On that same date, SEPTA filed a Motion to Stay all proceedings in this Court pending resolution of the appeal. On March 7, 2007, the Court granted the Motion as unopposed. In that same Order, the Court also denied Plaintiff's Motion for

Class Certification with leave to renew after resolution of the appeal. By Order dated December 22, 2008, the Third Circuit affirmed the Order of this Court entered on February 12, 2007.

SEPTA subsequently filed a Petition for a Writ of Certiorari with the United States Supreme Court which was ultimately denied. SEPTA agreed to allow Plaintiffs to file an amended complaint while the Petition was pending, but the parties agreed that all other activity would cease pending resolution of the Writ. On May 27, 2009, Plaintiffs filed an Amended Collective Action Complaint against SEPTA. On June 10, 2009, Plaintiffs filed a Second Amended Collective Action Complaint against SEPTA. On July 15, 2009, SEPTA filed a Motion to Dismiss the Second Amended Complaint, raising for the first time that the Court lacked subject matter jurisdiction over this action because the Plaintiffs' claim was subject to arbitration under the collective bargaining agreement ("CBA") between SEPTA and Plaintiffs' Union, Transport Workers Union Local 234 (the "Union").

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a court may dismiss a case for lack of subject matter jurisdiction. The plaintiff has the burden of establishing subject matter jurisdiction. Carpet Group Int'l v. Oriental Rug Imp. Ass'n, 277 F.3d 62, 69 (3d Cir. 2000).

A Rule 12(b)(1) motion may present either a facial or factual challenge to subject matter jurisdiction. "A challenge to a complaint for failure to allege subject matter jurisdiction is known as a 'facial' challenge, and must not be confused with a 'factual' challenge contending that the court in fact lacks subject matter jurisdiction, no matter what the complaint alleges..." N.E. Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 341 n.7 (3d Cir. 2001). In the case sub judice, SEPTA raises a factual challenge to subject matter jurisdiction.

In deciding a factual challenge to subject matter jurisdiction, a court is "free to weigh the evidence and satisfy itself as to the existence of the power to hear the case....[N]o presumptive

2

truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Carpet Group, 227 F.3d at 69.

The Second Amended Complaint defines the Plaintiffs as follows:

> [at] different times within three years of their commencement of the litigation, each plaintiff has driven SEPTA swing runs in circumstances in which their total weekly work time routinely equaled or exceeded 40 hours. All plaintiffs routinely performed daily pre-trip inspections before morning and afternoon, though they were not paid for their afternoon inspections.

Second Amended Complaint at ¶ 6. The CBA defines a "swing run" as follows:

> 2) A swing run is a scheduled run which includes a single continuous period, in addition to any rest or meal period which may be scheduled in order to comply with any law or governmental requirement, between the scheduled starting time and the scheduled finishing time during which period no work is scheduled and any such period and any such rest period will not be included in the pay time for the run.

CBA at 39.(attached to Defendant's Motion to Dismiss Second Amended Complaint as Exhibit B).

Further insight into the regimen and compensation of a swing run bus driver is provided by the affidavit of Willie Brown, the current President of the Union. Brown avers, inter alia, that:

> In the morning, the swing-run operator picks up his run at the dispatcher's window. The schedule associated with the run, which is posted in the depot, indicates his 'outbound p.m.' time, which is the time the driver's second half begins. It also represents the precise time swing operators go on the clock and start to accrue pay for working the second half. Thus, for example, if a swing run operator's 'outbound p.m.' time is 2 p.m., that driver is not on the clock until 2 p.m., the same time he his [sic] expected to leave the depot. With the operator not 'on the clock' until 2 p.m. and his bus required to leave the depot at the same time, he must perform the required pre-trip inspection 'off the clock,' prior to the start of his second half.

> Operators assigned a swing run are not paid for the hours that elapse between their first and second halves, although they do receive a 'swing run allowance' for the inconvenience associated with working a split shift, an 'allowance' negotiated by the Local and included in the CTD contract with SEPTA since at least 1950 (decades before the advent of the pre-trip inspection).

> Under Pennsylvania law, all SEPTA bus drivers are required to conduct a 'pre-trip' safety inspection before taking their vehicles into revenue service. SEPTA does not compensate operators for the time spent performing the required pre-trip inspection at

> the start of the operator's second half. Instead, operators perform pre-trip inspections 'off-the-clock' by reporting to work earlier than required. The failure to conduct the pre-trip inspection can result in a fine and a possible license suspension....

Affidavit of Willie Brown at ¶¶ 5-7 (attached to Plaintiffs' Response to Defendant's Motion to Dismiss as Exhibit 1).

Plaintiffs describe their FLSA claim as follows:

> Under the Fair Labor Standards Act...employees must be paid 1.5 times their regular rate for all hours over 40 worked in a week. Under decided law, the statutory protection applies to-among others-SEPTA's drivers. Accordingly, SEPTA's failure to pay drivers for their afternoon pre-inspection trip violates federal overtime laws and affects hundreds of SEPTA employees.

Second Amended Complaint at ¶¶ 1-3.

Plaintiffs seek unpaid overtime compensation, an equal amount of liquidated damages and attorneys fees and costs. Id.

In its Motion to Dismiss, SEPTA argues that since resolution of Plaintiffs' FLSA claim will require the Court to interpret certain provisions in the CBA, Plaintiffs must pursue their remedy through the procedures contained in the Labor Management Relations Act such as grievance and arbitration. Plaintiffs respond that SEPTA has waived its argument that this case must be arbitrated and that in any event since there is no provision in the CBA which explicitly covers afternoon pre-trip inspections, this Court will not have to interpret the CBA and therefore Plaintiffs' FLSA claim may proceed.

With respect to the issue of waiver, the parties have spent the last three years solely litigating the issue of SEPTA's sovereign immunity. As a result, this case is still in its infancy as evidenced by Plaintiffs filing their Second Amended Complaint on June 10, 2009, and by the fact that the several hundred co-plaintiffs only began to opt in on February 9, 2009. No discovery has taken place on the merits of Plaintiffs' claims and no dispositive motions have been filed. In short, the case

is back to square one. While SEPTA certainly could have raised the arbitration issue earlier, Plaintiffs will not be prejudiced by having the arbitration issue decided at this juncture.

With regard to the issue of arbitration, the Court notes that in Barrentine v. Arkansa-Best Freight Sys., Inc., 450 U.S. 728, 736-37 (1981) the United States Supreme Court held that an employee may bring an FLSA claim in federal court even after having unsuccessfully pursued such a claim through the applicable collective bargaining agreement's grievance and arbitration procedure.

However, in Vadino v. A. Valey Eng'rs., 903 F.2d 253 (3d Cir. 1990), the Third Circuit held that Barrantine does not permit union-represented employees to proceed directly to federal court with an FLSA claim where the resolution of the claim would require the court to interpret a disputed provision of the underlying collective bargaining agreement. Specifically, the Court stated:

> [W]hile claims resting on the language of section 7(a) [of the FSLA, 29 U.S.C. § 707(a)] are clearly cognizable under that section, we believe that claims which rest on interpretations of the underlying collective bargaining agreement must be resolved pursuant to the procedures contemplated under the LMRA, specifically grievance, arbitration, and, when, permissible, suit in federal court under section 301.

Vadino, 903 F.2d at 266.

The Court concluded that since the wages Vadino sought depended on the resolution of a specific dispute as to the correct wage rate under the collective bargaining agreement, Vadino must submit his claim to arbitration.

Following Vadino, this Court dismissed a donning and doffing claim brought under the FLSA since there was a specific provision in the applicable collective bargaining agreement that provided for twelve minutes pay per week to provide for wash up time. See Townsend v. BC Natural Chicken LLC, 2007 WL 442386 (E.D.Pa. Feb.2, 2007). The Court concluded that since resolution of the donning and doffing claim would require the Court to interpret the "wash-up" provision in the collective bargaining agreement, the Plaintiffs must, pursuant to Vadino, submit their claims to the

5

grievance/arbitration procedure contained in the collective bargaining agreement before proceeding with any FLSA claim.

On the other hand, in <u>Andrako v. United States Steel Corp.</u>, 2008 WL 2020176 (W.D.Pa. May 8, 2008), Chief Judge Ambrose denied a motion to dismiss for failure to exhaust administrative remedies since, unlike in <u>Townsend</u>, there was no express provision in the applicable collective bargaining agreement concerning time for donning and doffing. As a result, Chief Judge Ambrose ruled that Plaintiffs could proceed with their FLSA claims.

Similarly, in <u>Gallagher, et al. v. Lackawannna County</u>, No. 07-0912 (M.D.Pa. May 30, 2008)(J.Vanaskie), unionized corrections officers and sergeants sought overtime for time spent having to attend pre-shift meetings and for having to pick up freshly charged radio batteries. Noting that the applicable collective bargaining agreement was completely silent regarding compensation for attending pre-shift meetings and did not provide for the arbitrability of statutory claims such as those brought under the FLSA, the Court held that the plaintiffs could proceed with their FLSA claims in federal court.

In <u>Moeck v. Gray Supply Corp.</u>, 2006 WL 42368 (D.N.J. Jan. 5, 2006), unionized workers sought overtime for having to engage in pre-shift and post-shift activities. Applying <u>Barrentine</u> and <u>Vadino</u>, the Court held that the workers were not required to grieve the dispute under the collective bargaining agreement because determining what constitutes work involves interpretation of the FLSA, not the agreement. <u>See id.</u> at *6-8. The Court stated that workers are not barred from obtaining a judicial resolution of their FLSA claims merely because their "contractual and statutory rights arise from the same factual occurrence." <u>Id</u>. at *8.

In sum, if, in order to resolve a Plaintiff's FLSA claim, the Court must interpret a contractual provision in the applicable collective bargaining agreement the parties must first exhaust the remedies contained in that agreement. If, however, there is no provision in the applicable

6

collective bargaining agreement which would cover plaintiff's FSLA claim, the plaintiff may proceed with a statutory FLSA claim in federal court. Therefore, the only issue the Court needs to decide in the case <u>sub judice</u> is whether resolution of Plaintiffs' FLSA claim requires interpretation of the CBA.

In the first instance, the Court notes that the grievance and arbitration provisions of the CBA make no reference to the FLSA nor does it provide for arbitration of statutory claims, including FLSA claims. Both provisions are written in generalized language. For example, grievances are available "where the subject matter of the dispute involves the application, implementation or interpretation of any of the provisions of the collective bargaining agreement..." CBA at 4. Likewise, arbitrations are permitted if the disposition of the grievance "is not satisfactory to the Union..." CBA at 14.

SEPTA, however, directs the Court's attention to a number of provisions in the CBA which it contends the Court will have to parse in order to resolve Plaintiffs' claims for compensation for performing pre-trip inspections. For instance, SEPTA cites section 401 of the CBA which states, in pertinent part:

> **Section 401. Platform Work; Runs; Minimum Day**
>
> (a) Platform work is the operation of passenger vehicles in revenue service by...buspersons...and the performance of other assigned duties by stationpersons; the switching, placing, make-up, inspection,...and the performance of such work by other employees...
>
> (b) Wages paid for platform work performed will be calculated by multiplying the pay time (to the nearest tenth of an hour) for each class of platform work performed by the established hourly wage rate for such work to which the employee is entitled by the length of one's service with the Authority.
>
> (c) Where an employee is required to report in advance of the scheduled starting time of one's run or turn in passenger receipts or to so report and turn in, and does so, one-quarter hour will be added to the scheduled run time and the employee will be paid for that one-quarter hour at the aforesaid rate. This one-quarter hour will be treated as

time worked for all purposes except in calculating daily overtime under Section 404(c).

(d) Platform work is assigned by runs and as extra work (wildcats). Runs are classified as straight runs, swing runs or trippers.

CBA at 38-39.

Plaintiffs concede that subsection (c) covers the morning pre-trip inspection by adding 15 minutes to the scheduled run time for having to report in advance of the scheduled starting time. See Plaintiffs' Opposition Brief at 16. However, Plaintiffs correctly point out that subsection (c) is completely silent as to the afternoon pre-trip inspections since these occur, not prior to the commencement of a driver's work day, but during a driver's uncompensated rest period. Therefore, the Court finds that it will not have to interpret any part of section 401 in order to resolve Plaintiffs' FLSA claim seeking compensation for performing afternoon pre-trip inspections.

SEPTA also suggests that the Court will have to interpret other provisions in the CBA. Specifically, SEPTA refers the Court to the sections on time allowances and overtime. Once again, the Court finds that these sections do not apply since the afternoon pre-trip inspections occur during the swing driver's uncompensated rest period.[1]

---

[1] A time allowance (swing run allowance) will be made for each swing run. The swing run allowance will be whichever is the greater of (1) fifteen minutes or (2) one minute for each two minutes of scheduled spread time in excess of ten hours but not in excess of eleven hours, one minute for each minute of scheduled spread time in excess of twelve hours. The scheduled spread time of a swing run is the elapsed time (exclusive of any rest or meal period which may be scheduled in order to comply with any law or governmental requirement) from the scheduled start of the run to the scheduled finish of the run.

The pay time for a swing run will be the total of the scheduled work hours for the run, one-half of any such scheduled work hours that exceed eight hours and the swing run allowance and said pay time shall not be less than that of a minimum day. A swing run is a day's work for employees of the transportation departments

CBA at p. 39.

**Section 404. Overtime**

(a) Pay time for overtime work will be one and one-half times the scheduled work hours for the overtime work performed.

(continued...)

Any doubt about whether the CBA covers afternoon pre-trip inspections is resolved by the Brown affidavit. Significantly, SEPTA has not refuted any of the averments contained in the Brown affidavit. Brown avers, <u>inter alia</u>, that:

> More importantly, the claims asserted in this litigation are not subject to the contractual grievance and arbitration procedures because, despite the Union's best efforts, the Local has been unable to negotiate contract language requiring payment for the performance of pre-trip inspections at the start of an operator's second half.
>
> In fact, during contract negotiations in 2005 and 2009, Local 234 raised the issue of [increased report time to provide adequate time to conduct a pre-trip inspection in the morning and] payment for the pre-trip inspection performed at the start of the second half <u>because the collective bargaining agreement fails to address that time at all.</u> However, in both rounds of negotiations SEPTA refused to include payment for the second-half pre-trip inspections in the contract, and in 2009 SEPTA declined to even entertain the subject when Local 234 informed SEPTA–in response to an inquiry from SEPTA's attorney–that the Union did not have the authority to settle this lawsuit in exchange for addressing pre-trip inspection compensation issues going forward.

Brown affidavit at ¶¶ 10-11. (Emphasis added).

The Court agrees with Plaintiffs and finds that there is no express provision anywhere in the CBA, which the Court would have to interpret in order to decide Plaintiffs' FLSA claims. Accordingly, the Defendant's Motion to Dismiss is denied.

An appropriate Order follows.

---

[1](...continued)
>
> (b) Platform work, excluding lateness, performed in addition to a day's work by an employee will be classified as overtime work and paid as such.
>
> (c) Platform work, excluding lateness, report and turn-in time identified in Section 401© performed in excess of eight (8) hours in any one day will be classed as overtime work and paid as such.
>
> (d) When a minimum day run is performed as overtime, the pay time therefore will be one and one-half times the minimum day.

CBA at p. 41.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLISON COOPER, et al. | : | |
| | : | |
| Plaintiffs | : | CIVIL ACTION |
| | : | |
| vs. | : | NO. 06-CV-888 |
| | : | |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY | : | |
| | : | |
| Defendant | : | |

ORDER

AND NOW, this 16th day of March, 2010, it is hereby ORDERED that the Motion of the Defendant to Dismiss the Second Amended Complaint [Doc. #48] is DENIED.

It is further ORDERED that Defendant shall file an Answer to the Second Amended Complaint within 20 days of the date of this Order.

BY THE COURT:

*S/THOMAS M. GOLDEN*
THOMAS M. GOLDEN, J.