IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALLISON COOPER, et al.,                    :
                                           :
            Plaintiffs,                    :
                                           :          CIVIL ACTION
            v.                             :          NO. 06-888
                                           :
SOUTHEASTERN PENNSYLVANIA                  :
TRANSPORTATION AUTHORITY,                  :
                                           :
            Defendant.                     :

## OPINION

**Slomsky, J.**                                    **September 6, 2011**

## I.      INTRODUCTION

Before the Court is Plaintiffs' Motion to Approve Settlement and Enter Judgment or, in the alternative, for Leave to Amend the Complaint (Doc. No. 129).  On December 3, 2010, the parties informed the Court they had agreed to a settlement in this case.  In the ensuing weeks, however, it became clear that a dispute remained over the terms of a release and waiver of claims.  Unable to reconcile their differences, Plaintiffs filed the instant Motion, seeking to enforce the alleged settlement agreement.  For reasons that follow, the Court will deny Plaintiffs' Motion.

## II.     SUMMARY OF THE FACTS

### A.      Background

On February 28, 2006, Allison Cooper, a ten-year veteran bus driver with the Southeastern Pennsylvania Transportation Authority (SEPTA), filed a class-action lawsuit on

behalf of her fellow drivers against SEPTA, alleging SEPTA required bus drivers to perform pre-trip inspections of their buses without pay in violation of, among other things, the Fair Labor Standards Act.[1]  (Doc. No. 1.)  SEPTA is a mass transit authority that serves the region surrounding Philadelphia, Pennsylvania, with its principal office located at 1234 Market Street in Philadelphia.  (Id. at ¶ 11.)

In this case, two classes of bus drivers have potential claims against SEPTA: "straight run" drivers and "swing run" drivers.  Straight run drivers work a single eight-hour shift from start to finish.  (Id. at ¶ 16.)  Swing run drivers work a morning shift and an afternoon shift, with an unpaid break of varying lengths in between.  (Id.)  SEPTA requires all bus drivers to perform safety inspections on their vehicles before each "run," whether in the morning or afternoon.  (Id. at ¶ 4.)  Plaintiffs allege that SEPTA did not pay its swing run drivers for inspections before their afternoon run.  (Id.)  Plaintiffs also allege that SEPTA underpaid both swing run and straight run drivers for morning inspections.  (Id. at ¶ 5.)

The initial Complaint alleged five counts: (1) Violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq.; (2) Violation of Pennsylvania's Minimum Wage Law, 43 Pa. Cons. Stat. § 333.104; (3) Breach of Contract; (4) Unjust Enrichment; and (5) Violation of Pennsylvania's Wage Payment and Collection Law, 43 Pa. Cons. Stat. § 260.1 et seq.  The claim in Count One was brought on behalf of Cooper "and all others similarly situated."  (Id. at ¶ 37–42.)  The claims in Counts Two through Five were brought on behalf of two putative classes:

---

[1]       This case was initially assigned to Judge Stewart Dalzell.  On August 10, 2006, the case was reassigned to Judge Thomas M. Golden.  (Doc. No. 21.)  After Judge Golden's passing, the case was assigned on August 11, 2010 to this Court.  (Doc. No. 86.)

the "swing shift class" and the "morning pre-trip class."[2]   (Id. at 9–13.)

On May 27, 2009, a First Amended Complaint was filed, listing dozens of named Plaintiffs.  (Doc. No. 42.)  It consisted of only a single class of "swing run" drivers, whose "weekly work time routinely equaled or exceed[ed] 40 hours . . . [and who] performed daily pre-trip inspections before each run, morning and afternoon, though they were not paid for their afternoon inspections."  (Id. at ¶ 6.)  The First Amended Complaint alleged only a violation of FLSA.

On June 10, 2009, a Second Amended Complaint (Doc. No. 43) was filed.  On July 15, 2009, SEPTA filed a Motion to Dismiss (Doc. No. 48), arguing that as a semi-governmental body, SEPTA possessed sovereign immunity under the Eleventh Amendment.  (Doc. No. 129-1 at 4.)  On March 17, 2010, Judge Golden denied the Motion.  (Doc. No. 62.)  On May 3, 2010, Plaintiffs filed a Third Amended Complaint (Doc. No. 75).  The Third Amended Complaint named over six hundred Plaintiffs and made two significant changes.

First, a claim for uncompensated "shuttle time" was added.  The shuttle time claim sought compensation for swing run drivers who ended their morning shift and were then required to make a trip, sometimes as long as thirty-five minutes,  from a "relief point" back to the depot to

---

[2]      Plaintiffs described the "swing shift class" as:

All current and former SEPTA drivers who, at any time within three years of the commencement of this action, conducted a pre-trip inspection a. before the start of their second swing shift of the day, b. were not paid for this work, and c. who were assigned a shift that equaled or exceeded 8 hours of daily labor.

(Doc. No. 1 ¶ 45.)  The "morning pre-trip class" was defined as: "All current and former SEPTA drivers who, at any time within three years of the commencement of this action, conducted a morning pre-trip inspection and were assigned a shift that equaled or exceeded 8 hours of daily labor."  (Id.)  Cooper was a member of both classes.

begin an afternoon shift, or the reverse, from the depot to a relief point.  (Id. at ¶ 3.)  In the past, SEPTA did not pay drivers for their shuttle time.

Second, the Third Amended Complaint only covered "second trip inspections" (uncompensated pre-trip inspections performed before the second swing shift in the afternoon), and "shuttle time."  (Id. at ¶ 5.)  These claims pertain to any swing run employee whose "total compensated and uncompensated work time exceeds forty hours."  (Id.)  The Third Amended Complaint also contains the following language: "Plaintiffs and opt-ins in this case do not seek additional compensation for the morning in-depot inspection despite the inadequate time allotted by SEPTA for its performance."[3]  (Id. at ¶ 20.)

    B.    <u>Mediation and Settlement Negotiations</u>

As noted, on August 11, 2010, the case was reassigned from Judge Golden to this Court. (Doc. No. 86.)  About that time, the parties began settlement discussions.  In addition, on September 24, 2010, the Court conditionally certified the class of Plaintiffs, and class members were notified.  (Doc. No. 99.)  Opt-in forms were distributed to the class members.  (Doc. No. 129-1 at 5.)  By November 19, 2010, the date the opt-in period ended, approximately 1,300 bus drivers had opted into the lawsuit.  (Id.)  The dispute was mediated on December 1 and December 2, 2010.  (Doc. No. 135 at 6.)  During the mediation, SEPTA's counsel stated that SEPTA wanted to include a waiver and release of the morning inspection claim.  (Doc. No. 137 at 4).  Plaintiffs rejected this proposal.  (Id.)  Plaintiffs claim that SEPTA suggested that language describing the procedural history of Plaintiffs' complaints could be listed instead, which

---

[3]    SEPTA contends that the phrase "in this case" indicates that Plaintiffs contemplated the possibility of a renewed morning inspection claim in the future.

Plaintiffs agreed to.  (Id.)  SEPTA disputes this claim.  On December 2, 2010, SEPTA offered to pay $1.75 million to settle the matter, and emailed a "term sheet" with the basic, broadly defined terms of the agreement.  (Doc. No. 135 at 6; Id. at Ex. B.)  The term sheet provided as follows:

     A.    Stipulated Judgment to be Submitted to Court

Recitations, including language discussed by counsel re: allegations of Complaint and failure to pursue morning pre-trip, attached as Exhibit A

Reference to procedures regarding notification to class - stipulated notice to potential class members, approval by court, 30-day period in which to opt-in, etc, - fair and adequate notice process and reasonable opportunity to join procedure

Mutually agreeable resolution to avoid cost of litigation

Non-Admission Clause

Settlement Amount

Attorney's fees and costs amount

Release/Waiver of claims through date Court approves stipulated judgment

Terms of Payment to class members - through SEPTA Payroll Department, with ordinary and applicable deductions

     B.    Settlement Agreement and Release

Preamble

Settlement Amount, including breakdown on payment to class members

Attorney's fees

Release

Non-Admission

Administration - details regarding how plaintiffs will notify SEPTA of payments to applicable class members, payments and dates thereof, language re: ordinary and applicable payroll deductions

(Id.)  As stated above, one of the terms was a "Release/Waiver of claims through [the] date [the] Court approves [the] stipulated judgment."  (Id.)  Attached to the term sheet as Exhibit "A" was a brief procedural history, including language mentioning Plaintiffs' former allegations involving the morning inspections.  (Id. at 3.)

The next morning, on December 3, 2010, Plaintiffs informed SEPTA that Plaintiffs had agreed to SEPTA's terms.  (Id. at 7.)  Plaintiffs' counsel did not ask for clarification of any of the language in the term sheet, signed the term sheet, and faxed it back to SEPTA's counsel.  (Id. at 7; Id. at Ex. C p. 1.)  The Court was notified on December 3, 2010 that a settlement had been reached.  (Doc. No. 137 at 3).  As of December 3, 2010, the parties believed that an agreement had been reached to settle this matter based on the broadly defined terms listed in the term sheet.[4]

On December 17, 2010, SEPTA prepared a more comprehensive draft settlement agreement and sent it to Plaintiffs' counsel.  (Doc. No. 135 at 7; Id. at Ex. D.)  SEPTA's draft included a release of all claims that had been asserted in the Complaint, Second Amended Complaint, and Third Amended Complaint.  (Id. at 7; Id. at Ex. D ¶ 6(a).)  Language was included that would have released SEPTA from liability on morning inspection, afternoon inspection, and shuttle time claims.  SEPTA also sent a draft stipulated judgment, which included similar release language.  (Id. at Ex. E ¶ 17.)  SEPTA contends a full release of all these claims is what it was "purchasing" for $1.75 million.  (Id. at 1.)

On December 21, 2010, Plaintiffs' counsel sent back a redlined copy of the settlement agreement to SEPTA's counsel which changed the terms of release to claims that "were or could

---

[4]     The term sheet can be characterized as a broad skeleton outline. Its terms are not well-defined and this imprecision spills over to the release/waiver term, which is at issue here. Most of the other listed items also seem to be written imprecisely.

have been brought" in the case.  (Id. at 7; Id. at Ex. F ¶ 6(a).)  On January 3, 2011 SEPTA's counsel rejected Plaintiffs' release language because it did not specifically include release of the morning inspection claim.  Plaintiffs assert that, despite the negotiations that took place during the mediation, this is the first time SEPTA stated that it would not settle without release of the morning inspection claim.  (Doc. No. 129-2 ¶ 37.)

      C.    <u>Stray Email Chain</u>

On January 3, 2011, SEPTA's counsel brought to Plaintiffs' counsel's attention that Plaintiffs' counsel had unwittingly forwarded on December 21, 2010 to SEPTA's counsel, a chain of internal emails along with the redlined settlement agreement.  (Doc. No. 135 at Ex. H.) The internal emails were sent back and forth among Plaintiffs' counsel before the entire chain was inadvertently forwarded to SEPTA's counsel.  This critical email, obviously intended to be sent only from Plaintiffs' counsel to her co-counsel after reviewing SEPTA's draft settlement agreement, states:

> The problem we anticipated is in the release.
>
> SEPTA is now asking for a release of claims that could have [sic] not have been brought in this litigation, but which could have been arbitrated.  So, now what?  If Allison, Dickie and John sign off on this, it will mean that none of the named plaintiffs can recover for any morning pre-trip inspection time.
>
> I think we need to either reject the language, which could tank the settlement, or we need to address this directly with our clients, Bodner and Clay.
>
> There is one other possibility.  That is to refuse to sign with this language and move to enforce the settlement terms we agreed to.  I'm not sure how I think this plays out since I don't have the terms in front of me.
>
> What say you?

(Id. at Ex. G p. 2.)  After the notification about the email, Plaintiffs' counsel sent a written request

to SEPTA's counsel to destroy the email.  Plaintiffs' did not take any further action regarding the email until it was addressed in their Reply Brief.  (Doc. No. 137 at 8–9.)

Although SEPTA posted a notice on January 13, 2011 informing bus drivers that SEPTA would begin paying swing run drivers for afternoon inspections and shuttle time, progress toward a final settlement agreement came to a halt after the January 3, 2011 conversation.  (Doc. No. 129-2 ¶ 41.)  On February 22, 2011, Plaintiffs filed the Motion seeking to enforce the settlement agreement.

## III.    LEGAL STANDARD

A district court has "the inherent power to enforce agreements entered into in settlement of litigation pending before [it]."  Bamerilease Capital Corp. v. Nearburg, 958 F.2d 150, 152 (6th Cir. 1992).  "[W]hether a settlement agreement is a valid contract between the parties is determined by reference to state substantive law governing contracts generally."  Id. (quotation marks and alteration omitted); accord Vargo v. Mangus, 94 Fed. App'x 941, 943 (3d Cir. 2004).  "To be enforceable, a settlement agreement must possess all of the elements of a valid contract.  As with any contract, it is essential to the enforceability of a settlement agreement that 'the minds of the parties should meet upon all the terms, as well as the subject-matter, of the agreement.'"  Mazzella v. Koken, 739 A.2d 531, 536 (Pa. 1999) (quoting Onyx Oils & Resins, Inc. v. Moss, 80 A.2d 815, 817 (Pa. 1951)) (citations and alteration omitted).  "If all the material terms of a bargain are agreed upon, the settlement agreement will be enforced.  If, however, there exist 'ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce,' such an agreement must be set aside."  Mazella, 739 A.2d at 537 (quoting Miller v. Clay Twp., 555 A.2d 972 (Pa. Commw. Ct. 1989) (citation and alteration

omitted).

## IV.   DISCUSSION

In order for a contract to be enforceable, there must be mutual assent, or what is commonly referred to as a "meeting of the minds." McNutt v. Estate of McNutt, 366 Fed. App'x 113, 115–16 (3d Cir. 2010); Am. Lumber & Mfg. Co. v. Atl. Mill & Lumber Co., 290 F. 632 (3d Cir. 1923); see 1 Corbin on Contracts § 4.13 (2011). SEPTA argues that no settlement was reached because the parties did not agree on waiver and release of the morning inspection claims. The Court agrees, and for this reason will deny the Motion.

### A.   Mutual Assent

Plaintiffs contend that SEPTA has "buyer's remorse" and is backing out of the settlement agreement. (Mot. Hr'g Tr. 5:3 June 14, 2011.) SEPTA, on the other hand, asserts that it has never taken a position that it would settle without releasing all claims. SEPTA does not dispute that an agreement was reached on December 3, 2010, but argues the agreement was based on broad terms, imprecisely defined, that were material to the agreement and had yet to be agreed upon in a final draft.

An enforceable agreement requires mutual assent. Degenhardt v. Dillon Co., 669 A.2d 946, 950 (Pa. 1996); Restatement (Second) of Contracts § 17 (1981). "Mutual assent or agreement has been defined simply as an expression of agreement between or among parties which is usually accomplished by an offer and acceptance." Great N. Ins. Co. v. ADT Sec. Servs., 517 F. Supp. 2d 723, 736 n. 10 (W.D. Pa. 2007).

Here, Plaintiffs contend that the parties orally agreed to the following terms: "$1,750,000 to settle the afternoon pre-trip inspection and shuttle time claims . . . [which also included]

lawyers' fees and reimbursement for costs" and "[a] separate agreement with the drivers' union . . . to, prospectively, pay for the time spent by drivers conducting the afternoon pre-trip inspections and for their shuttle time." (Doc. No. 129-1 at 6.) Plaintiffs state that it was after this oral agreement was reached that SEPTA prepared the term sheet, and "[t]here was no mention, whatsoever, either in writing or by the lawyers, of a limitless release." (Id.)

The Court is not persuaded that this alleged agreement is enough to form a binding agreement. After SEPTA offered to pay $1.75 million to settle, SEPTA prepared a term sheet with broadly outlined terms. With regard to release and waiver of claims, the term sheet simply stated "Release/Waiver of claims through date Court approves stipulated judgment." (Doc. No. 135, Ex. B.) Although release of claims is mentioned, this description is too ambiguous to be useful. With no further clarification, Plaintiffs signed off on the term sheet. The alleged agreement makes no mention of the actual terms of release or waiver, which is an important part of what SEPTA agreed to pay $1.75 million for. On December 17, 2010, once a draft settlement agreement was prepared that specified the claims to be released, the parties could not agree on final terms, and negotiations faltered. Consequently, there was never a mutual assent regarding the release and waiver of claims.

The terms of release were material — in fact, they were perhaps the most important terms from SEPTA's point of view. See Restatement (Second) of Contracts § 34 cmt. a (1981) (Although parties to a contract need not agree upon all terms for a contract to be binding, and may leave a choice of terms to be made by a party, "[t]he more important the choice is, the more it is likely that the parties do not intend to be bound until the choice is made.")

Plaintiffs' assertion that the release language proposed by SEPTA in the draft Settlement

Agreement "simply had not come up at any time previously" is unsupportable in view of the

critical disagreement.  (Id. at 6.)  To the contrary, SEPTA insists that it had maintained this

position throughout the negotiations.  In Plaintiffs' counsel's affidavit in support of Plaintiffs'

Motion, she acknowledges that SEPTA had placed the morning inspection waiver on the

negotiating table during the mediation.  (Doc. No. 129-2 ¶ 29.)  Plaintiffs contend that they

rejected the morning inspection language and a compromise was reached by including the

litigation's procedural history as an exhibit to the term sheet.  (Doc. No. 137 at 4.)  This is

disputed by Defendant.

Furthermore, the stray email chain is evidence that a final agreement on the terms of the

morning inspection waiver had not been reached.[5]  Plaintiffs' counsel states that she

---

[5] Plaintiffs contend the Court may not consider the stray email chain.  They contend that it
is privileged attorney work product and was inadvertently disclosed.  Therefore, it is covered
under Federal Rule of Evidence 502(b), and the privilege is not waived.  The Court does not
agree.

Federal Rule of Evidence 502(b) states that disclosure of a document does not waive
privilege if: "(1) The disclosure is inadvertent; (2) the holder of the privilege or protection took
reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to
rectify the error, including (if applicable) following Fed. R. Civ. P. 26(b)(5)(B)."  Fed. R. Evid.
502(b); Rhoads Indus. v. Bldg. Materials Corp. of Am., F.R.D. 216, 219 (E.D. Pa. 2008).  The
Court looks to the following five factors in determining whether a privilege has been waived:

(1) The reasonableness of the precautions taken to prevent inadvertent disclosure in
view of the extent of the document production.
(2) The number of inadvertent disclosures.
(3) The extent of the disclosure.
(4) Any delay and measures taken to rectify the disclosure.
(5) Whether the overriding interests of justice would or would not be served by
relieving the party of its errors.

Id.

After consideration of the five Rhoads factors, the arguments made by the parties, and the
evidence here, the Court finds that Plaintiffs waived their attorney work product privilege, and
the stray email chain may be considered in deciding this Motion.  The fourth and fifth factors

"anticipated" SEPTA's inclusion of the release language covering the morning pre-trip inspection.  (Doc. No. 135 at Ex. 6 p. 2.)  Plaintiffs attempt to parry this language by explaining that the email merely signified the concerns of Plaintiffs' counsel that SEPTA might renege on the agreement.  The Court is not persuaded that this concern was the reason for the language used in the email.

The more plausible scenario is that Plaintiffs and SEPTA failed to arrive at a final agreement about what claims would be released.  In other words, there was no meeting of the minds on a material term before the parties prematurely announced they had agreed on a settlement.

Recognizing that a court may conclude that there was no valid settlement agreement, Plaintiffs argue in the alternative that the terms of waiver and release are not material, and should not bar a finding of a valid agreement.  In support of this assertion, Plaintiffs cite Mastroni-Mucker v. Allstate Ins. Co., 976 A.2d 510, 522 (Pa. Super. Ct. 2009), and Wolf v. Consol. Rail Corp., 840 A.2d 1004 (Pa. Super. Ct. 2003).  In these cases, an oral settlement agreement was made between the parties, but the terms of release were not specified.  In both cases, the Pennsylvania Superior Court held that the settlement agreement was binding, even without stipulated terms of release.  However, those cases are factually distinguishable from this case.

_____

weigh heaviest upon the Court's decision.  Plaintiffs made little effort to prevent disclosure of the email chain, and at one point even used the email chain as supporting evidence.  (Doc. No. 137 at 8.)  Additionally, in determining the validity of the Settlement Agreement, the email chain is helpful to the Court in determining the intent of the parties during the negotiations, which serves the interests of justice in a way that substantially outweighs the benefit of relieving Plaintiffs of their error.  The Court shall consider the email chain, along with the other admissible evidence, in rendering a decision.  Even without this email chain, the decision of the Court on the instant Motion would be the same.

In both <u>Mastroni-Mucker</u> and <u>Wolf</u>, the oral settlement agreements were made on the record before a trial judge.  In <u>Mastroni-Mucker</u>, although the specific terms of the release were not laid out, there was no dispute as to the terms of release like there is here.  In <u>Wolf</u>, after the oral agreement on the record had been made, defendant attempted to add a written release provision, which plaintiff refused to sign.  In both cases, the Pennsylvania Superior Court held that the terms of release were not material, and were not in dispute at the time the agreement was made.

Here, the terms of release are a material provision, as the release was discussed throughout the settlement negotiations.  Moreover, release and waiver language, although imprecise, was included on the term sheet, indicating the importance of the matter.

The evidence indicates that the parties did not reach an agreement on the terms of release and waiver.  Because there was no mutual assent on the material terms of settlement, the Court is unable to enforce the settlement agreement.[6]

B.      <u>Leave to Amend the Complaint</u>

As an alternative in their primary Motion, Plaintiffs request that the Court allow leave to

---

[6]      Plaintiffs also argue that SEPTA's position on the morning inspection waiver is barred by judicial estoppel. Plaintiffs contend SEPTA argued in its July 15, 2009 Motion to Dismiss that the morning inspection claim should be arbitrated and not be part of this case. Plaintiffs argue that SEPTA changed its position by now arguing that the claim must be covered in a settlement release.  For judicial estoppel to apply: (1) the party to be estopped must have taken two irreconcilably inconsistent positions; (2) the party changed his or her position in bad faith; and (3) the Court's application of judicial estoppel must be narrowly tailored to address the identified harm, or remedy the damage done.  <u>Montrose Med. Grp. Participating Sav. Plan v. Bulger</u>, 243 F.3d 773, 779–80 (3d Cir. 2001).  Judicial estoppel is not warranted in this case because SEPTA's argument that the morning inspection claim must be arbitrated is not irreconcilable with a desire to be released from liability on the claim in the settlement agrement.  Moreover, there is no evidence of bad faith.

amend the Third Amended Complaint to add the morning inspection claim, allow the parties to conduct discovery on that claim, and request the Court's approval to send a second notice to class members, informing them that the morning inspection claim is now at issue in the litigation. The Court notes, however, that on June 21, 2011, another case, <u>Bell v. SEPTA</u>, No. 11-4047, was filed in this Court seeking compensation for the morning inspection. The <u>Bell</u> Complaint states "This case involves only the first pre-trip inspection of the day, which usually - though not always - occurs in the morning. There is a different lawsuit pending in this judicial district that covers Operators' second-half pre-trip inspections." (<u>Bell v. SEPTA</u>, No. 11-4047, Doc. No. 1 ¶ 3.) Given the filing of this seemingly related action, and the unknown dynamic between the two cases at this time, the Court will deny Plaintiffs' current Motion for Leave to Amend the Complaint without prejudice. A joint status hearing will be held in both cases at which the Court will consider the matter of Plaintiffs request for leave to amend the complaint.

## V.     CONCLUSION

For the foregoing reasons, the Court will deny Plaintiffs' Motion to Approve Settlement and Enter Judgment or, in the Alternative, for Leave to Amend the Complaint.

An appropriate Order follows.